Filed 2/18/15  P. v. Lawson CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B252907 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA090404) |
| v. | |
| TREVOR JAMES LAWSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James B. Pierce, Judge.  Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Trevor James Lawson killed Tommy Whitson IV and injured Juan Nunez, after a fight outside a bar. Defendant contended at his trial for murder and attempted murder that he acted in self-defense, in response to the victims' attack. The jury, however, found defendant guilty of second degree murder and of attempted premeditated and deliberate murder. Defendant contends that the judgment must be reversed because the jury was not fully instructed on the general principles of law concerning self-defense and was not instructed at all on involuntary manslaughter. He also contends that the exclusion of a percipient witness's out-of-court statements violated his constitutional right to present a complete defense. We reject these contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background.

#### A. *The Prosecution's Case*.

On October 22, 2011, Whitson and Nunez, the victims, were at Fern's Bar in Long Beach with Marisol Galvez and Eloy Sotelo. Galvez, Nunez, and Sotelo were Hispanic. Whitson was White. The group drank four 24-ounce cans of beer at Fern's, although the group had a "round" earlier in the night.[1]

Around closing time at 1:45 a.m., the group went outside to the parking lot to have a cigarette. Other people, including defendant, were in the parking lot. A man who appeared to be homeless was asking people for a cigarette. When the man asked defendant for a cigarette, defendant loudly and repeatedly asked the man if he was White. Overhearing this, Whitson asked defendant if he could have a cigarette even though Whitson wasn't White. Defendant, who was about 20 feet from Whitson, said, " 'But you are White.' " Whitson responded, " 'What if I wasn't White, would you still give me a cigarette?' " Defendant said, " 'No.' " According to Nunez, defendant's answers upset Whitson.

---

[1] Nunez testified that he had a 24-ounce can of beer plus a pint of beer that evening.

Defendant and Whitson yelled at each other. Defendant walked to Whitson, until they were three feet from each other.[2] Nunez got between the two men and pushed Whitson back, telling him to chill out. Nunez told defendant to calm down. Galvez also tried to get between Whitson and defendant.

Nunez was pushing Whitson back, when Nunez felt a light punch on his back. At that point, Whitson started fighting defendant, over Nunez's shoulder.[3] Feeling punches on his back, Nunez turned and tried to hit defendant, although Nunez did not know if he made contact. Nunez felt punches on his stomach. Defendant, who had a better angle, made contact with Whitson. Nunez saw Whitson bleeding from a wound in his neck. Neither Nunez nor Whitson had or used any weapon against defendant.

Defendant fled. Nunez had been stabbed three times, but he survived. Whitson died, having received three stab wounds: a fatal wound to his neck that was two and one-half inches deep; one to his chest that was three inches deep; and a third to his torso, also three inches deep. Whitson had a small curved abrasion on the back of his left wrist and a small "cutting wound" on the back of his right hand. His blood alcohol content levels were elevated.[4]

Long Beach Police Officer Gregory Krabbe interviewed Nunez, who told the officer that Whitson and defendant bumped chests. Whitson got riled up and knocked defendant's hat off his head. Defendant told Whitson to "give me my fucking hat back." Whitson told defendant to "pick that shit up on your own."

Nunez, however, testified that he did not remember seeing Whitson knock defendant's hat off defendant's head. Galvez also did not see Whitson hit the hat off defendant's head.

---

[2]    Galvez also testified that defendant approached her group, and defendant and Whitson exchanged words.

[3]    Galvez was unsure who threw the first punch.

[4]    He had a .12 femoral blood alcohol content; .11 heart blood alcohol content; and .13 vitreous blood alcohol content.

When defendant was arrested the day after Whitson died, defendant had no injuries, except a tiny scratch on the top portion of his right hand and small abrasions on his elbows. He did not complain of any injuries or pain.

B. *The Defense Case.*

**1. October 22, 2011: The Current Incident.**

Defendant testified. At approximately 1:00 a.m., he arrived at Fern's and had a "couple" of drinks. After last call, he went to the parking lot to have a cigarette. A homeless man approached defendant, who asked the man how he was. The man asked defendant for a cigarette, and defendant gave him one.

Whitson, who defendant described as a big White man, was with a group of people standing about 15 to 20 feet from defendant. Whitson asked defendant for a cigarette. Defendant approached the group and handed a cigarette to Whitson. When Whitson asked if defendant was a skinhead, defendant replied, " 'No[,] [b]ut what if I was?' " Whitson told him, " 'Well, we don't like your kind of people around here.' " " 'You're not a skinhead. You're just a punk, a White boy.' " Whitson pushed defendant and took defendant's hat, holding it above defendant's head. When defendant told Whitson to give him back his hat, Whitson dropped the hat and hit defendant's jaw.

Defendant staggered back, almost to the ground. Another man, Nunez, entered the fray, and Nunez and Whitson "started swinging from—I guess it would be, not an up and down, but more of a standing above me type of angle." They hit defendant, who was in a "crouched position," on his shoulders and the back of his head. Scared for his life, defendant pulled a pocket knife from his pocket,[5] opened it and "proceeded to try and defend [him]self." He "tried blocking [his] face and swinging at the same time." He swung the knife "[m]aybe six times." "[A]fter that, . . . the two people that were swinging down on me were gone," so defendant stood and left, fearing retaliation. He never intended to stab anybody.

---

[5] Defendant carried a pocket knife "because it helps at work and it helps just with everyday life."

Gloria Cabrera testified that she was in the parking lot of Fern's Bar when Whitson was killed. Because she was the designated driver for her group, she was sober. While in the parking lot, she saw a "thin guy" and two heavyset guys.[6] The larger men behaved aggressively towards the smaller man, and it looked to Cabrera as if the bigger men were bullying the smaller man. When one of the larger men took the smaller man's hat, the smaller man said, " 'give me back my cap.' " The smaller man was also upset and arguing. Cabrera did not see how the argument started.

Officer James Mondragon testified that Nunez told him Whitson confronted defendant, and then Whitson and defendant approached each other. Whitson told defendant to pick up his own hat, and Whitson began to walk away but defendant charged at Whitson. Whitson and defendant then began to fight.

### 2. September 29, 2011: The Prior Incident Involving Whitson.

One month before he was killed, Whitson was at a beach with his girlfriend Christine Castagnola and Nunez. Castagnola asked a group that included Daniel Alamillo and "Robert" if she could have a cigarette. When Castagnola walked away, the group laughed at her. Whitson asked why were they laughing at or hitting on his girlfriend. Whitson then hit Robert, who was sitting on a wall. Alamillo hit Whitson, knocking him to the ground. Nunez told Whitson to chill out. But Whitson got a crowbar from his car and, when he tried to hit Alamillo with it, he instead hit Alamillo's windshield, cracking it.[7]

Defendant was not present at and had nothing to do with this event.

---

[6] Nunez was six feet tall and weighed 300 pounds. Whitson was 6 feet 2 inches tall and weighed 260 pounds.

[7] Nunez testified that Whitson got a windshield wiper.

## II.     Procedural Background.

An information, filed on April 26, 2012, alleged against defendant count 1, the murder of Whitson (Pen. Code, § 187, subd. (a)),[8] and count 2, the attempted willful, deliberate and premeditated murder of Nunez (§§ 187, subd. (a), 664).  The information alleged as to both counts that defendant personally used a deadly and dangerous weapon, a "bladed instrument" (§ 12022, subd. (b)(1)).

On August 29, 2013, a jury rejected finding defendant guilty of first degree murder and instead found him guilty of second degree murder (count 1) and of attempted willful, deliberate and premeditated murder (count 2).  As to both counts, the jury found true the allegations that defendant personally used a deadly and dangerous weapon, under "[s]ection 12022.53[, subdivision] (b)(1)."[9]

On November 6, 2013, the trial court, after denying defendant's motion for a new trial, sentenced defendant, on count 1, to 15 years to life plus one year for the weapon use enhancement, and, on count 2, to a consecutive seven years to life plus one year for the weapon use enhancement.  Defendant was therefore sentenced to a total of 24 years to life in prison.

### DISCUSSION

## I.     Instructional Error.

Defendant makes five claims of instructional error:  the trial court failed to instruct on the applicable principles of law; the court's response to a jury question was inadequate; the court should not have instructed on mutual combat; the court should have sua sponte instructed on involuntary manslaughter; and defendant's trial counsel provided ineffective assistance of counsel by failing to ensure that the jury was properly instructed.  After discussing applicable general legal principles, we reject each contention.

---

[8]     All further undesignated statutory references are to the Penal Code.

[9]     This appears to be a typographical error.  The weapon enhancement was alleged under section 12022, subdivision (b)(1).

6

A.  *General Legal Principles.*

A trial court must instruct, sua sponte, on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.  (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Abilez* (2007) 41 Cal.4th 472, 517; *People v. Breverman* (1998) 19 Cal.4th 142, 154.)  This duty includes a duty to instruct on lesser included offenses when there is substantial evidence from which the jury could conclude the defendant is guilty of the lesser offense.  (*People v. Thomas* (2012) 53 Cal.4th 771, 813; *People v. Manriquez* (2005) 37 Cal.4th 547, 584, 587.)  Substantial evidence is evidence that a reasonable jury could find persuasive.  (*People v. Benavides* (2005) 35 Cal.4th 69, 102.)  In deciding whether there is substantial evidence of a lesser included offense, we do not evaluate the credibility of witnesses, a task for the jury.  (*Manriquez*, at p. 585.)

We independently review whether the trial court erred by failing to instruct on a lesser included offense (*People v. Booker* (2011) 51 Cal.4th 141, 181) and whether the instructions given were correct and adequate (*People v. Riley* (2010) 185 Cal.App.4th 754, 767; *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1311-1312; *People v. Lopez* (2011) 198 Cal.App.4th 698, 708).  Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it, if they are reasonably susceptible to such interpretation.  (*Riley*, at p. 767; *Lopez*, at p. 708.)  We "look to the instructions as a whole and the entire record of the trial, including the arguments of counsel," and assume that jurors are intelligent persons, capable of understanding and correlating the instructions given.  (*Lopez*, at p. 708; see also *Riley*, at p. 767.)

B.  *The Instructions on Self-Defense Were Adequate.*

The gist of defendant's first argument is he was deprived of his state and federal rights to due process of law (Cal. Const., art. I, § 15; U.S. Const., 14th Amend.), because the instructions failed to inform the jury how evidence of an assault or battery by the victims was relevant to defendant's claim of self-defense.  In other words, because there was evidence defendant responded to an assault or battery by Whitson and Nunez, the trial court should have instructed on principles of assault (CALJIC Nos. 9.08 [assault

7

with hands or fists], 5.31 [assault with fists, when use of deadly weapon not justified]; 9.00 [defining assault], 9.02 [assault with a deadly weapon or by means of force likely to produce great bodily injury]; CALCRIM Nos. 875 [assault with deadly weapon or force likely to produce great bodily injury], 900 [assault on a firefighter, peace officer or specified victim]) and on principles of battery (CALJIC Nos. 16.140 [elements of battery], 16.141 [battery, force and violence defined], CALCRIM Nos. 925 [battery causing serious bodily injury], 960 [simple battery]).

The notion that Whitson and/or Nunez instigated the confrontation with defendant, who simply responded to the victims' aggression, however, was adequately covered in the instructions given. The jury was instructed that to find defendant guilty of first or second degree murder, the People had to prove that defendant acted with malice aforethought and without lawful excuse or justification. (CALCRIM Nos. 520, 521; see also CALCRIM Nos. 600, 601 [attempted deliberate and premeditated murder].) Lawful excuse and justification—that is self-defense—were explained in CALCRIM No. 571 (voluntary manslaughter, imperfect self-defense) and in CALCRIM No. 505 (justifiable homicide). Defendant acted in perfect self-defense if he actually and reasonably believed he was in imminent danger of being killed or of great bodily injury and used no more force than necessary. (See generally *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) Defendant acted in imperfect self-defense if he actually believed he was in imminent danger of being killed or of great bodily injury and actually believed that deadly force was necessary to defend against the danger, but at least one of those beliefs was unreasonable. (See generally *id.* at p. 1082.) As to both perfect and imperfect self-defense, the jury was instructed to consider all the circumstances as they were known to and appeared to defendant.[10]

The jury was also instructed that a person who engages in mutual combat or is the initial aggressor has a right of self-defense if he actually and in good faith tried to stop fighting, indicated his desire to stop fighting to his opponent, and gave his opponent the

_____

[10] The jury was also instructed on these principles in connection with the attempted murder of Nunez. (CALJIC Nos. 603, 604.)

8

chance to stop fighting (CALCRIM No. 3471). And if "defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force." (CALCRIM No. 3471.)

In addition to these self-defense principles, the jury was instructed on the effect of provocation on the degree of murder and on reducing murder to manslaughter. (CALCRIM No. 522.) The jury was thus told that to reduce murder to manslaughter, defendant " 'must have acted under the direct and immediate influence of provocation . . . . While no specific type of provocation is required, slight or remote provocation is not sufficient . . . . [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition[,] in the same situation and knowing the same facts[,] would have reacted from passion rather than [from] judgment.' "

Taken together, these instructions covered the principles raised in the instructions that defendant claims should have been given. (See generally *People v. Lopez, supra,* 198 Cal.App.4th at p. 708; *People v. Riley, supra,* 185 Cal.App.4th at pp. 767-768.) The possibility that Whitson and/or Nunez attacked defendant, compelling defendant to respond, was the very premise underlying the self-defense instructions. The idea, expressed in defendant's proposed CALJIC No. 5.31,[11] for example, that an assault with fists does not justify a defendant's use of a deadly weapon unless defendant reasonably believed the assault was likely to inflict great bodily injury, was addressed in the perfect and imperfect self-defense instructions, both of which discussed a defendant's actual or reasonable belief in the need to defend against great bodily injury (CALCRIM Nos. 571,

---

[11] "An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believes and a reasonable person in the same or similar circumstances would believe that the assault is likely to inflict great bodily injury upon [him] [her]." (CALJIC No. 5.31.)

9

505). Defendant's proposed instructions are therefore akin to pinpoint instructions, which "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case . . . . [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

For similar reasons, we reject defendant's related argument that the jury should have been instructed that insulting words alone are not justification for an assault or battery. (See, e.g., CALJIC Nos. 9.11, 16.142.) According to Nunez, defendant made racially offensive comments to Whitson, that is, defendant would only give a cigarette to a White person. Defendant therefore argues that the jury should have been informed that his words were insufficient to invite Whitson's assault. (See, e.g., *People v. Manriquez, supra,* 37 Cal.4th at p. 586 [although verbal provocation can reduce murder to manslaughter, a victim calling defendant a " 'mother fucker' " and taunting defendant by telling him if he had a weapon, he "should take it out and use it," were "insufficient to cause an average person to become so inflamed as to lose reason and judgment"].) But Whitson and Nunez were not on trial for assault or battery; whether defendant provoked an assault was therefore, at most, peripheral to the issues in the case. Rather, a main issue in the case was whether defendant was justified in responding with deadly force to any assault. The jury, as we have said, was fully and adequately instructed on this issue.

C.    *The Trial Court's Response to the Jury Question.*

If the trial court had no sua sponte duty to give additional instructions *before* the jury retired for deliberations, such a duty, defendant contends, arose *during* deliberations, when the jury asked, "What does #3 he killed without[] lawful excuse/or justific[a]tion. [¶] Are fists considered legal weapons?"[12] The court responded: "An example of lawful excuse or justification is self-defense. [¶] Fists can be used lawfully or unlawfully but

---

[12]    The jury was likely referring to the elements of murder: first, defendant committed an act that caused the death of another person; second, when the defendant acted, he had a state of mind called malice aforethought; and, third, he killed without lawful excuse or justification. (CALCRIM No. 520.)

10

are not weapons themselves." The court's response did not deprive defendant of his state and federal constitutional rights.

If "the original instructions are themselves full and complete," whether additional explanation is required "to satisfy the jury's request for information" is a matter left to the trial court's discretion. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682; see also *People v. Smithey* (1999) 20 Cal.4th 936, 985; § 1138 [court has a duty to provide jury with information the jury desires on points of law].) Indeed, " 'comments diverging from the standard are often risky. [Citation.]' " (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1015; see *People v. Montero* (2007) 155 Cal.App.4th 1170, 1179 [court did not abuse its discretion in advising the jury to re-read the form instruction].)

The jury's question did not obligate the trial court to give the panoply of instructions discussed in Section B, *ante*. Rather, the jury asked what the third element of murder—excuse and justification—meant. The court properly told the jury it referred to self-defense. The jury also asked whether fists are legal weapons. The court properly instructed that fists can be used lawfully or unlawfully but are not themselves weapons. (See *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1034 [hands, fists and feet are not deadly weapons under the aggravated assault statute, section 245].) Moreover, the answers to these questions were in instructions the court gave; for example, CALCRIM Nos. 571 and 505, regarding self-defense, and CALCRIM No. 3145, regarding personal use of a deadly weapon. Defendant does not suggest that the court's response was incorrect, and we therefore conclude that the court did not abuse its discretion or violate defendant's constitutional rights by responding in the way it did to the jury's questions.

D.    *Mutual Combat.*

Defendant contends that there was insufficient evidence of mutual combat, and therefore the trial court deprived him of his right to a fair trial by instructing on that theory. (Cal. Const., art. I, § 15; U.S. Const., 14th Amend.) The People agree that "the evidence did not demonstrate a situation involving mutual combat." But the People

11

assert that the instruction, CALCRIM No. 3471, was nonetheless appropriate because there was evidence that defendant was the initial aggressor. We agree with the People.

CALCRIM No. 3471 contains two concepts: first, mutual combat and, second, "initial aggressor."[13] Mutual combat consists of "fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight. The agreement need not have all the characteristics of a legally binding contract; indeed, it necessarily lacks at least one such characteristic: a lawful object. But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose.*" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1046-1047; see also *The People v. Vicente Sanchez* (1864) 24 Cal. 17, 27 ["[I]n [the] case of mutual combat, in order to reduce the offence from murder to manslaughter, it must appear that the contest was waged upon equal terms, and no undue advantage was sought or taken by either side"]; *People v. Lee* (1999) 20 Cal.4th 47, 60, fn. 6.) The People appear to agree there was scant, if any evidence, of an agreement to fight.[14]

---

[13] The trial court instructed the jury with CALCRIM No. 3471 as follows: " 'A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; and [¶] 2. [h]e indicated by word or conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting; and [¶] 3. [h]e gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only nondeadly force[,] and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.' " The trial court also gave CALCRIM No. 3472, stating that the right of self-defense may not be contrived.

Defendant's trial counsel did not object to these instructions.

[14] There was evidence Whitson and defendant "bumped chests." Perhaps this might raise an inference that an implied agreement to fight was reached.

Regardless of the applicability of mutual combat, there was evidence of the second concept in CALCRIM No. 3471; namely, that defendant was the initial aggressor. Nunez and Galvez testified that defendant and Whitson exchanged words. Defendant walked from where he was standing to Whitson, so that they were just feet apart. Nunez got between the two men and tried to calm them down, but he felt a light punch on his back. At that point, Whitson started fighting defendant. From this evidence, the jury could have found that defendant argued with and approached Whitson and threw the first punch by hitting Nunez. Therefore, to the extent CALCRIM No. 3471 discusses initial aggressors, there was sufficient evidence to support it.

To the extent the instruction was in error because it referred to mutual combat, the error was harmless, under the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836, that is, whether it is reasonably probable defendant would have obtained a more favorable outcome had the error not occurred. (See *People v. Ross, supra,* 155 Cal.App.4th at pp. 1054-1055 [similar instructional error was reviewed under the *Watson* standard].) First, given the scant evidence that defendant and the victims mutually consented or agreed to fight, it is unlikely the jury relied on a mutual combat theory. Also, the prosecutor did not argue mutual combat. She argued that defendant was the initial aggressor; for example, she told the jury to decide whose version of events to believe: defendant's or Nunez's and Galvez's. Because defendant "picked the fight," he "doesn't get to claim self-defense."

Second, the instruction did not either require "jurors to presume Whitson and/or Nunez were acting lawfully" or "remove[] [defendant's] defenses from the jury's consideration." The jury could have found that defendant was not the initial aggressor, in which case defendant was entitled to raise self-defense. Also, if the jury believed that defendant was not the initial aggressor or had another interpretation of the evidence, the jury would have ignored CALCRIM No. 3471 and reviewed the perfect and imperfect self-defense instructions. Indeed, the jury was instructed that some " 'of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about

13

the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.' " (CALCRIM No. 200.) CALCRIM No. 3471 applied to just one scenario supported by the evidence. It did not preclude the jury from considering other scenarios, including self-defense.

      E.     *Failure to Instruct on Involuntary Manslaughter.*

Defendant contends that the trial court erred by failing to instruct sua sponte on involuntary manslaughter, thereby depriving him of his state and federal constitutional rights to due process and a jury trial.[15] We find that any error was harmless.

---

[15]     CALCRIM No. 580, which was not given provides: "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. [¶] The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed (a crime/ [or] a lawful act in an unlawful manner); [¶] 2. The defendant committed the (crime/ [or] act) with criminal negligence; [¶] AND [¶] 3. The defendant's acts caused the death of another person. [¶] [The People allege that the defendant committed the following crime[s]: ___ *<insert misdemeanor[s]/infraction[s])/noninherently dangerous (felony/felonies)>*. [¶] Instruction[s] ___ tell[s] you what the People must prove in order to prove that the defendant committed ___ *<insert misdemeanor[s]/infraction[s])/ noninherently dangerous (felony/felonies)>*.] [¶] [The People [also] allege that the defendant committed the following lawful act[s] with criminal negligence: ____ *<insert act[s] alleged>*.] [¶] *Criminal negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act. [¶] [An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a

14

Involuntary manslaughter is a lesser included offense of murder.  (*People v. Thomas, supra,* 53 Cal.4th at p. 813.)  Under section 192, subdivision (b), there are two statutory types of involuntary manslaughter.  First, involuntary manslaughter is a killing without malice "in the commission of an unlawful act, not amounting to a felony." (§ 192, subd. (b); see also *People v. Lee, supra,* 20 Cal.4th at pp. 60-61 [while holding a gun, the severely intoxicated defendant argued with his wife and shot her; the defendant was entitled to instruction on misdemeanor involuntary manslaughter].)  Second, involuntary manslaughter is a killing without malice "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  (§ 192, subd. (b); see also *People v. Manriquez, supra,* 37 Cal.4th at p. 587; *People v. Burroughs* (1984) 35 Cal.3d 824, 835, disapproved on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 89; *People v. Murray* (2008) 167 Cal.App.4th 1133, 1140.)  Our California Supreme Court has identified a third type of involuntary manslaughter:  an unintentional homicide committed in the course of a noninherently dangerous felony may constitute involuntary manslaughter if the felony is committed without due caution and circumspection.  (*Burroughs*, at pp. 835-836 [defendant who treated cancer victim with intense massage that caused the victim to hemorrhage was entitled to instruction on involuntary manslaughter]; see also *People v. Butler* (2010) 187

consequence is natural and probable, consider all of the circumstances established by the evidence.]  [¶]  [There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death.  A *substantial factor* is more than a trivial or remote factor.  However, it does not need to be the only factor that causes the death.]  [¶] *Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.  [¶]  [The People allege that the defendant committed the following (crime[s]/ [and] lawful act[s] with criminal negligence):  ___ <*insert alleged predicate acts when multiple acts alleged*>.  You may not find the defendant guilty unless all of you agree that the People have proved that the defendant committed at least one of these alleged acts and you all agree that the same act or acts were proved.]  [¶]  In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life.  If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter."

15

Cal.App.4th 998, 1007.) Here, defendant relies on the first and second theories of involuntary manslaughter: (1) misdemeanor manslaughter based on defendant's brandishing a knife in violation of section 417, subdivision (a)(1);[16] and (2) negligent homicide.[17]

We need not decide whether the trial court should have instructed on involuntary manslaughter, because any such error was harmless. Reversal is required if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of. (*People v. Rogers* (2006) 39 Cal.4th 826, 867-868.) But where the factual question posed by the omitted instruction was necessarily resolved adversely to defendant under other, properly given instructions, instructional error is harmless. (*People v. Beames* (2007) 40 Cal.4th 907, 928; *People v. Elliot* (2005) 37 Cal.4th 453, 475.)

By definition, involuntary manslaughter involves the absence of malice. (§ 192, subd. (b).) In convicting defendant of second degree murder, the jury necessarily found that defendant acted with malice aforethought. (See generally *People v. Robertson* (2004) 34 Cal.4th 156, 164 [second degree murder requires malice aforethought, but not the additional elements of premeditation and deliberation, which elevate a murder to first degree], overruled on other grounds by *People v. Chun* (2009) 45 Cal.4th 1172; § 187, subd. (a).) The jury was instructed on first or second degree murder with malice

---

[16] Brandishing a weapon "may be committed by drawing or exhibiting a weapon in a rude, angry, or threatening manner." (*People v. Booker, supra,* 51 Cal.4th at p. 189; *People v. Thomas, supra,* 53 Cal.4th at p. 814.)

[17] "[C]riminal negligence is the governing mens rea standard for all three forms of committing the offense." (*People v. Butler, supra,* 187 Cal.App.4th at p. 1007; see also *People v. Penny* (1955) 44 Cal.2d 861.) "If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast[,] where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice." (*People v. Evers* (1992) 10 Cal.App.4th 588, 596 [where evidence established that the defendant intentionally used force against two-year-old victim, knowing the probable consequences of his action, involuntary manslaughter instruction is not required].)

aforethought (CALCRIM No. 520). Malice is either express or implied: a defendant acts with express malice when he "unlawfully intended to kill" and with implied malice when the killing resulted from an intentional act, the natural consequences of which are dangerous to human life, performed with knowledge of and conscious disregard for the danger to human life. (CALCRIM No. 520; see also *People v. Dellinger* (1989) 49 Cal.3d 1212, 1221-1222.) By finding defendant guilty of second degree murder, the jury necessarily found that he acted with malice. We therefore must conclude that any error in failing to instruct the jury on involuntary manslaughter was harmless.[18]

In addition, the evidence strongly supported a conclusion that defendant acted with at least implied malice. Whitson and Nunez were unarmed, a fact that defendant did not dispute. Defendant, however, pulled out a knife and swung it in Whitson's and Nunez's direction, stabbing each of them multiple times. Such conduct "is highly dangerous and exhibits a conscious disregard for life." (*People v. Thomas, supra,* 53 Cal.4th at p. 815 [putting a gun to a person's head and threatening to kill him exhibits a conscious disregard for life].)

Moreover, based on the jury's verdict finding defendant guilty of the attempted premeditated and deliberate murder of Nunez, it is not reasonably probable that the jury would have found defendant guilty merely of the involuntary manslaughter of Whitson. To find defendant guilty of attempted murder, the jury must have found that he had the specific intent to kill. (*People v. Stone* (2009) 46 Cal.4th 131, 136.) The jury was instructed: " 'A person may intend to kill a specific victim or victims[] [and] [a]t the same time intend to kill everyone in the particular zone of harm or kill zone. [¶] In order to convict the defendant of the attempted murder of Juan Nunez, the People must prove the defendant not only intended to kill Tommy Whitson, but also either intended to kill Juan Nunez or intended to kill everyone within the kill zone. If you have a reasonable

---

[18] The jury rejected first degree murder, which required a finding that the defendant acted willfully, deliberately and with premeditation. (CALCRIM No. 521.) The jury also rejected voluntary manslaughter based on heat of passion (CALCRIM No. 570) and voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571).

doubt whether the defendant intended to kill Juan Nunez . . . by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Juan Nunez." (CALCRIM No. 600.) Therefore, in finding defendant guilty of attempted murder, the jury necessarily found that he had an intent to kill, a finding irreconcilable with involuntary manslaughter. The jury also found true that the attempted murder of Nunez was deliberate and premeditated. Given these verdicts, it is not reasonably probable that the jury would have found that defendant intended to kill Nunez but not Whitson.

F.      *Ineffective Assistance of Counsel.*

If defendant's counsel failed to ensure that the jury was properly instructed on the applicable law, then, defendant contends, his trial counsel provided ineffective assistance. But a defendant claiming ineffective assistance of counsel must establish both error and prejudice. (See generally *Strickland v. Washington* (1984) 466 U.S. 668.) Because we have concluded that no error or prejudice occurred as a result of any of the alleged failures of trial counsel, we reject defendant's claim.

## III.    The Exclusion of Sotelo's Out-of-Court Statements.

When Whitson and Nunez were stabbed, their friend, Sotelo, was with them. Sotelo, however, did not testify. The trial court therefore excluded statements Sotelo made to the police. Defendant contends that the statements were admissible under a hearsay exception and, in any event, were admissible because they were necessary to his constitutional right to present a complete defense. We disagree.

A. *Additional Background*.

Nunez and Galvez identified Sotelo as a possible witness at the preliminary hearing in April 2012. By the time of a pretrial conference in August 2012, Sotelo had failed to appear for two appointments with the district attorney. The trial court continued the trial date to October 2012 so that Sotelo could be interviewed.

Officer Krabbe interviewed Sotelo twice. During the first interview, Sotelo confirmed he was with Whitson and Nunez at the bar, where they had at least two beers each. At closing time, they were walking out of the bar when Sotelo went back inside to

18

use the restroom. By the time Sotelo got outside, Whitson was already in a "confrontation" with defendant; Whitson and defendant were "in each other's faces." Nunez was "right by" Whitson, and although the argument did not look "heated," Whitson and defendant were "pretty close to each other." It looked to Sotelo like Whitson and defendant were going to fight, but Sotelo didn't want to fight so he stood "off kinda behind" Whitson. Sotelo turned, and when he looked back, Whitson was already bleeding. Sotelo grabbed defendant, who had been "thrown [his] way," and "threw him on the ground." Defendant asked Sotelo if he wanted "some too?" Defendant ran off.

During a second interview, Officer Krabbe told Sotelo that video surveillance suggested that Sotelo was outside when the confrontation began. Sotelo did not remember that; he only remembered "seeing the arms flying."

Sotelo appeared at a pretrial conference in September 2012, and he was ordered back for trial, which was continued several times. But, by May 8, 2013, the defense still had been unable to interview Sotelo, who was out of the county and uncooperative. The trial court therefore continued the trial to June 12, 2013.[19] The case was trailing for trial on June 17, 2013, when the prosecutor represented that attempts to contact Sotelo had failed. The defense asked for additional time to get a statement from Sotelo, because the defense believed that he could provide exculpatory evidence. The court said it would trail the case for trial. But, by the day set for trial, Sotelo had not been located, despite the defense's extensive efforts to find him. Based on the age of the case, the trial court trailed the case for trial.

By the time trial began, the defense had been unable to subpoena Sotelo, and it therefore moved to introduce his recorded statement as a statement against interest. The

---

[19] The defense, on May 30, 2013, filed a motion to compel Sotelo's appearance.

trial court found that Sotelo's statements were not admissible as statements against his penal interest.[20]

After the jury rendered its verdict in August 2013, defendant filed a motion for new trial, because Sotelo, having been arrested in October, had finally been located. The trial court denied the motion.

B.    *The Trial Court Did Not Abuse Its Discretion or Violate Defendant's Constitutional Rights by Excluding Sotelo's Statements.*

Defendant argues that Sotelo's statements were admissible as declarations against interest, and, even if they weren't admissible under this hearsay exception, they were admissible under defendant's state and federal constitutional rights to present a defense. We disagree.

An exception to the general rule that hearsay is inadmissible may exist where the statement of the declarant is against his or her interest. (Evid. Code, §§ 1200, subd. (a), 1230 [declarations against interest];[21] *People v. Duarte* (2000) 24 Cal.4th 603, 610.) "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*Duarte,* at pp. 610-611.) The exception in Evidence Code section 1230 is inapplicable to any statement or portion of a statement not itself " 'specifically disserving' " to the

---

[20]    The court also found that the statements were not admissible under *Crawford v. Washington* (2004) 541 U.S. 36. We need not address whether the statements were properly excluded under *Crawford,* because, as we discuss, they were properly excluded as hearsay.

[21]    "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

declarant's interests. (*Duarte*, at p. 612.) Moreover, even statements that appear to disserve the declarant's interests may not qualify for admission under Evidence Code section 1230, where, for example, the declarant tries to minimize or to "sympathetically" describe his or her participation in the crime. (*Duarte*, at p. 613.) And, to determine whether a statement meets the threshold requirement of reliability or trustworthiness, a trial court may take into account the words themselves, the circumstances under which they were uttered, the declarant's possible motivation, and the declarant's relationship to the defendant. (*Id.* at p. 614.)

Sotelo's statements do not meet the threshold requirements of Evidence Code section 1230. They do not "specifically disserve" Sotelo's interests. The gist of Sotelo's statement was that he was not present at the beginning of the confrontation between Whitson and defendant. Not wanting to get involved, Sotelo stood behind Whitson. He did not see how the fight began and he did not see who threw the first punch. Rather, he turned around, and, by the time he turned back, Whitson was already bleeding. Sotelo therefore minimized his involvement in the altercation.

That Sotelo pushed defendant to the ground does not, as defendant suggests, clearly expose Sotelo to charges for assault, battery, disturbing the peace or for Whitson's murder under the provocative acts doctrine.[22] By the time Sotelo encountered defendant, Whitson was already bleeding. Sotelo pushed defendant to the ground when defendant was "thrown" in his direction. Therefore, the suggestion that Sotelo committed an assault or battery or a murder is a dubious one. At no time during Sotelo's interviews did the police suggest that Sotelo was guilty of a crime. Indeed, Nunez was not charged with any crime arising out of the events at Fern's. It is therefore unlikely that Sotelo, whose participation in the events was minimal compared to Nunez's, would be charged.

Moreover, Sotelo's statements were not trustworthy. He did not stay at Fern's after Whitson was killed to talk to the police. In fact, he was not identified as a witness

---

[22] The provocative act doctrine refers "to a subset of intervening-act homicides in which the defendant's conduct provokes an intermediary's violent response that causes someone's death." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 649, fn. 2.)

21

until the preliminary hearing. Once identified as a witness, he evaded attempts to contact him, failing to appear for appointments and for trial. He also could not account for discrepancies between his statement he was not present at the beginning of the altercation and video surveillance showing he was present at that time. The trial court therefore did not abuse its discretion by finding Sotelo's statement did not constitute a declaration against his interest.

Given the nature and content of Sotelo's statement, we also fail to see how its exclusion implicated defendant's constitutional right to present a defense. (See generally, *Holmes v. South Carolina* (2006) 547 U.S. 319, 324 [" 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense" ' "]; *Crane v. Kentucky* (1986) 476 U.S. 683, 690; *Chambers v. Mississippi* (1973) 410 U.S. 284, 294 (*Chambers*.) Although this right can be abridged by evidence rules that infringe on the weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve (*Holmes*, at p. 324), the ordinary rules of evidence generally do not impermissibly infringe on the accused's right to present a defense (*People v. Lucas* (2014) 60 Cal.4th 153, 270; *Holmes*, at pp. 326-327).

Although defendant relies heavily on *Chambers*, that reliance is misplaced. In *Chambers*, Mississippi's evidentiary rules prevented the defendant from cross-examining a crucial witness, McDonald, who had confessed to the murder with which the defendant was charged. (*Chambers, supra,* 410 U.S. at pp. 291-294.) Those evidentiary rules recognized a hearsay exception for declarations against pecuniary interest but not ones against penal interests. (*Id.* at p. 299.) Evidence that McDonald made statements confessing to being the murderer was therefore excluded as hearsay. *Chambers* said: "Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of

22

trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." (*Id.* at p. 302.)

*Chambers*, however, "was an exercise in highly case-specific error correction." (*Montana v. Egelhoff* (1996) 518 U.S. 37, 52.) "[T]he holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." (*Id*. at p. 53; accord *People v. Gonzales* (2012) 54 Cal.4th 1234, 1258-1259 [exclusion of evidence that the defendant's wife had a family history of child abuse did not violate the defendant's right to present a defense]; *People v. Ayala* (2000) 23 Cal.4th 225, 269 [the defendant did not have either a constitutional or a state law right to present exculpatory but unreliable hearsay evidence inadmissible under any statutory exception to the hearsay rule].)

Under *Chambers* and its progeny, there may be the unusual case where a defendant's constitutional right to a meaningful opportunity to present a complete defense trumps an evidentiary rule, such as hearsay. This is not such a case. Defendant had a meaningful opportunity to present a defense, even in the absence of Sotelo's statement. Defendant testified that he acted in self-defense. Cabrera, the independent witness, testified, consistent with defendant, that it looked to her like Whitson and Nunez were bullying defendant: she saw Whitson take defendant's hat. And although Nunez denied at trial seeing Whitson take defendant's hat, Nunez told two police officers that Whitson knocked defendant's hat off his head.

Sotelo's statement added little to this evidence. He did not witness how the altercation between defendant and Whitson began. By the time Sotelo came outside, defendant and Whitson were already "in each other's faces." Sotelo saw arms "flying," but he did not see who threw the first punch. This evidence therefore merely confirmed

23

that Whitson and defendant fought. It did not speak to the defense theory that Whitson started the fight and that defendant had to defend himself with deadly force.

Defendant, however, suggests that Sotelo's statement buttressed his defense because the statement shows that the fight was three against one. Neither Sotelo's statement nor any of the evidence at trial, including defendant's own testimony, supports such a manipulation of Sotelo's statement. Defendant testified that he fought two men—Whitson and Nunez. Nunez testified that the only three men involved in the fight were he, Whitson, and defendant. Galvez similarly testified. Cabrera saw two large men (Nunez and Whitson) bullying a smaller man (defendant).[23]

We therefore conclude that the trial court did not abuse its discretion in excluding the evidence and that its exclusion did not violate defendant's due process or other constitutional right to present a defense.

C.    *The Trial Court Properly Denied the Motion for New Trial.*

For reasons similar to the ones expressed above, we reject defendant's related contention that the trial court erred by denying his motion for a new trial, brought because Sotelo was in custody and therefore was available to testify.

A motion for a new trial may be granted when, for example, "new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, [¶] 8.) In ruling on a motion for a new trial based on newly discovered evidence, the trial court considers these factors: (1) the evidence, and not merely its materiality, must be newly discovered; (2) the evidence must not be merely cumulative; (3) the newly discovered evidence would render a different result probable on a retrial; (4) the party could not with reasonable diligence have discovered and produced the evidence at trial; and (5) the facts must be shown by the best evidence of which the case admits. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) A trial court's ruling on a motion for new trial is so completely within that court's

---

[23]    To some extent, Sotelo's statement harmed defendant. Defendant asked whether Sotelo "want[ed] some too." This could be interpreted as an admission that defendant intentionally stabbed Whitson and Nunez.

24

discretion that we will not disturb the ruling absent a manifest and unmistakable abuse of that discretion. (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.)

We have already found that Sotelo's statements were cumulative of other evidence presented at trial and that Sotelo's testimony added little to the defense's theory of the case. (*People v. Delgado, supra,* 5 Cal.4th at pp. 328-329.) The trial court therefore did not abuse its discretion by denying the new trial motion.

## IV.    Cumulative Error.

Defendant contends that the cumulative effect of the purported errors deprived him of a fair trial. As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KITCHING, Acting P. J.


LAVIN, J.[*]

---

[*]     Judge of the Superior Court of Los Angeles County assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.